Arlington Realty Company, Incorporated v. Commissioner.
Arlington Realty Co. v. Commissioner
Docket No. 79990.
United States Tax Court
T.C. Memo 1962-125; 1962 Tax Ct. Memo LEXIS 184; 21 T.C.M. (CCH) 653; T.C.M. (RIA) 62125; May 24, 1962
Fred R. Tansill, Esq., 824 Connecticut Ave., N.W., Washington, D.C., and Louis Hoppe, Esq., for the petitioner. Hubert E. Kelly, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies *185 in petitioner's Federal income taxes for the years 1952 and 1953 in the respective amounts of $8,424 and $6,537.87. These deficiencies arise as a result of respondent's disallowance of certain deductions claimed by the petitioner in each of the years involved. In the statutory notice of deficiency respondent disallowed as a deduction for the year 1953 the amount of $568.60 which petitioner had added to its reserve for bad debts because petitioner did not obtain respondent's permission to change from the specific chargeoff method to the reserve method. The petitioner did not assign that determination as error, and on brief the parties indicate the petitioner has conceded that the adjustment made by respondent was correct. The only other adjustment made by respondent, which accounts for the remainder of the deficiencies involved herein, was explained in a statement attached to the notice of deficiency as follows: It has been determined that you are not entitled to a deduction of $16,200.00 [in 1952 and $12,004.22 in 1953] claimed as a contribution to a profit-sharing trust since there was no plan and/or trust in existence. Petitioner assigns error in that determination, and the *186 sole issue remaining for our consideration is whether petitioner had such a plan and/or trust in existence during the years 1952 and 1953. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. The petitioner, Arlington Realty Company, Incorporated, is a corporation organized on January 3, 1945, under the laws of the Commonwealth of Virginia. Its principal office is located at 2300 Wilson Boulevard, Arlington, Virginia. Petitioner's activities include real estate brokerage, mortgage financing and servicing, insurance, and property management. It maintains its books and files its tax returns on a calendar year basis using an accrual method of accounting. Petitioner's Federal income tax returns for the years involved herein were filed with the district director of internal revenue at Richmond, Virginia. At all times material herein the petitioner had only four stockholders - James Abramson, Louis C. Carl, William F. Bergmann, and Henry A. Florence - all of whom were directors, and are sometimes hereinafter referred to by their surnames. James Abramson *187 was the majority stockholder and his wife, Lee Abramson, was also a director of petitioner. All of the directors took an active part in the conduct of petitioner's business and were in frequent contact with one another, and many decisions pertaining to petitioner's business were made without convening formal board meetings. When such meetings were held Carl, who was petitioner's executive vice president and secretary, prepared the minutes which recorded the actions taken by the board. Carl and James Abramson had been associated in the real estate business prior to the formation of petitioner. Carl was the oldest employee of the corporation and he was interested in having petitioner adopt a pension plan and trust arrangement. In 1950 he began collecting documents relating to such plans. The feasibility of petitioner's adopting such a plan was discussed by Carl with the other directors during the years 1951 and 1952. One of the plans which particularly appealed to Carl was contained in a brochure prepared by the Wellington Fund of Philadelphia and purported to satisfy the requirements of the Internal Revenue Code of 1939 [1] for deductibility of contributions made under such plans. *188 The retirement plan and trust found in the Wellington brochure required annual contributions by the employer to the trust, which was to benefit all of the employees with 3 or more years' service. The employer's contributions were to be credited to each eligible employee "in the ratio of regular basic compensation" paid the employees "to total basic compensation of all such employees for the year." It further provided that an employee would be entitled to the entire amount credited to his account in the event of death or retirement, and if his service were terminated for any other reason the employee would be paid a percentage of the amount credited to his account. The percentage to be paid depended upon the number of years of continuous service as of the last anniversary date of the plan, and amounted to 50 percent after 5 years of service, 75 percent after 10 years of service, and 100 percent after 15 years of service. All of the remaining provisions of the plan were either standard trust provisions or specific provisions designed to qualify the retirement *189 trust under applicable sections of the Internal Revenue Code. Sometime prior to December 15, 1952, Carl made certain penciled insertions, interlineations, corrections, and changes in the profit-sharing plan and trust agreement printed in the Wellington Fund brochure, hereinafter referred to as the Wellington plan. Among these penciled changes in the printed form of trust agreement was a provision that there be two trustees (Carl and Bergmann) instead of one, and the filling in of blank date to make it read December 15, 1952. At a meeting of the petitioner's stockholders and board of directors held on December 15, 1952, the Wellington plan, as modified by Carl, was discussed by those present. The material portions of the minutes of the meeting read as follows: There was a general discussion of the merits of this plan, after which on motion, duly made and carried, the Secretary was authorized to prepare a draft of Trust Indenture naming two of the elective officers as Trustees, and setting forth the basis of participation and interest in said fund, together with the basis of withdrawals therefrom, said draft to be drawn in collaboration with our attorney, Mr. Griffin T. Garnett, and presented for approval at our *190 next meeting. So far as possible the trust indenture should be drawn to comply with the company's intention that the trust satisfy those provisions of the Internal Revenue Code relating to employee's trusts; and under no circumstances shall any income or corpus of the trust or any funds contributed to the trust by the Company ever revert to or be used or enjoyed by the Company. It was further moved and seconded and carried that as we could not determine the exact amount of our gross salaries and profits for 1952 until after December 31, 1952, that a sum of $16,200.00 be established as our first contribution and that the $15,000.00 in debenture bonds presently held by this corporation with the accured [accrued] interest of $1,200.00 be turned over to Louis C. Carl, Temporary Trustee, for said fund and his receipt taken therefore, said $16,200.00 to be charged to Retirement Fund Expense, 1952. It was further moved and carried that in the event our retirement plan is not approved by Internal Revenue that the said Temporary Trustee be instructed to return the said fund to the corporation and that our auditor then be instructed to file an amended income tax return for the year 1952, *191 eliminating this item from our 1952 expense deduction, in such an event no employee shall have a vested right in such fund, or against the company for a contribution for 1952. The assets delivered to Carl as temporary trustee consisted of 15 bonds in the face amount of $1,000 each, 5 of which were issued by the Cafab Construction Corporation and the remainder by the Cafab Investment Corporation. Accrued interest on these bonds amounted to $1,200. Carl accepted the bonds on December 20, 1952, and executed a receipt for them as "Temporary Trustee." Petitioner's employees were advised of the board's action at a party held a few days before Christmas in 1952 at the Washington Golf and Country Club in Arlington, Virginia, at which Carl made an oral announcement to those present. Substantially all of petitioner's employees and their families attended the party. Due to pressure of other business which required Carl's attention the draft referred to in the minutes of the December 15, 1952, board meeting was not presented for approval at the next meeting of petitioner's directors, but a typed copy of the Wellington plan and trust agreement, as modified by Carl, was presented to the board *192 at a meeting held on June 22, 1953. The changes made by Carl in the Wellington plan consisted of the omission of a single paragraph of no relevance to this proceeding, the necessary changes in grammar resulting from the decision to use two trustees instead of one, and a modification of the formula under which the amount to be credited to each employee's account was determined in order to give effect to both length of service and the amount of salary paid annually through use of a point system, rather than basing the credits upon salary alone as in the Wellington plan. The spaces provided for filling in the number of points to be earned for each year of service and each $1,000 of annual salary were left blank. The percentage scale of payments to be made in the event of termination of service other than by death or retirement was expanded to provide for payment of 10 percent of the amount credited to an employee's account if the termination occurred after 5 years of service, 20 percent after 6 years, 30 percent after 7 years, 40 percent after 8 years, 60 percent after 9 years, 75 percent after 10 years, and 90 percent after the completion of 11 years of service. The entire amount would *193 be paid if the employee had completed 12 years of service. An unsigned copy of the draft was attached to the minutes of the meeting, which provide in part as follows: The Secretary presented a draft of our proposed retirement plan and trust agreement which he had prepared from various samples and data gathered over a period of time and which he proposed should be used as a basis for our plan. There was a general discussion of the proposed plan and on motion made and carried the Secretary was instructed to present this draft to our attorney, Mr. Griffin T. Garnett, Jr. for study and consultation and a revised draft to be prepared and submitted to the Board for further study when ready. In an office memorandum addressed to petitioner's employees on July 15, 1953, Carl referred to "our proposed profit sharing and retirement plan to be announced later." He further stated that "[details] are being studied and must be approved first." Sometime in 1953 counsel was engaged to secure the approval of the Internal Revenue Service and a conference to that end was arranged with respondent's representatives in Richmond, Virginia. In a letter dated November 12, 1953, petitioner's auditors *194 furnished Carl with certain cost data "in regard to the already existing pension plan." At a meeting of petitioner's directors held on November 15, 1953, petitioner's president asked for and received the board's approval to maintain Carl in his capacity as secretary and executive vice president beyond his 65th birthday, which occurred on November 16, 1953. This action was taken by petitioner's board in order to comply with certain provisions of the Wellington plan which conditioned eligibility to participate in the pension fund in such cases upon the board taking such action. Again in 1953 on some date before Christmas Carl advised petitioner's employees attending a Christmas party that a second contribution had been or would be made to the pension trust. This "contribution" was authorized at a meeting of petitioner's directors held on December 28, 1953, the minutes of which read in material part as follows: The Secretary reported on the progress made in preparing the retirement plan. Several drafts have been prepared and discussions have been held with the representatives of Internal Revenue Service, whose suggestions were promptly incorporated in said revisions. He stated further *195 that it would be necessary to authorize a contribution to the Fund for this year at this time, in order to include it in our 1953 expenses. He suggested that we turn over to the Trustee of the plan the following assets of Arlington Realty Company, Inc. as our 1953 contribution: Trust note of Donald E. and
Vivian B. McCord face
$ 3,287.78
interest accrued
16.44
Trust note of Mona Heights
Syndicate face
5,000.00
interest accrued
200.00
Note of William F. Berg-
mann for
3,500.00
Total
$12,004.22
The above [is] to be held in trust pending adoption of a trust indenture for retirement fund. Upon motion, duly made and carried, the proper officers were instructed to set these items up on the corporate books and deliver the documents to the Plan Temporary Trustee, taking his receipt therefor and making same a part of these minutes, on the same basis as last year. Once more Carl acknowledged the receipt of the assets as temporary trustee. Carl established a "master control account" for the retirement fund, and this account reflects contributions in the amounts of $16,200 at the end of 1952 and $12,004.22 at the end of 1953. These contributions were also *196 reflected in the petitioner's journal entries made shortly after the close of the taxable years. On its tax returns petitioner deducted as contributions to a pension, annuity, stock bonus, or profit-sharing plan for the taxable years involved the amounts delivered to Carl as temporary trustee of its alleged retirement plan. By letter dated February 19, 1954, the petitioner's attorney transmitted a copy of its proposed retirement plan and trust agreement to the Internal Revenue Service with a request for approval. This letter in material part reads as follows: Shortly prior to the close of the calendar year of 1952, the Arlington Realty Company became interested in effecting a retirement plan for the benefit of its employees. During the time that they were investigating the various provisions and methods pursuant to which a plan might be adopted, they set up a reserve for said plan which, at the close of the calendar year 1952, amounted to $16,200.00. This sum was set up with the understanding that if the plan was approved and that sum could be placed in the plan they would do so. If it were impossible to place such sum in the plan an amended income tax return for said year would *197 be filed. During 1953 the plan was formulated and at the end of 1953 the plan had been drafted and preliminarily approved by the corporation subject to approval by the Pension Trust Division of Internal Revenue. For the year of 1953, an additional sum of approximately $12,004.00 was placed in reserve for purposes of the retirement plan under the same provisos as set forth concerning the sum placed in reserve for the year 1952. The delay in forwarding the proposed plan and trust has been occasioned by research in connection with drafting the plan, review of the plan by the corporation and revisions not only to meet their needs but to meet the requirements of the Internal Revenue Code. Enclosed herewith you will find a copy of the proposed retirement plan and trust agreement substantiating said plan of the Arlington Realty Company, a Virginia corporation. My client would greatly appreciate the Trust Division reviewing said plan and trust and forwarding to me any comment, objection or approval in connection therewith in order that the plan may actually be placed in effect dating from the year 1952. In another letter addressed to Carl and dated April 6, 1954, petitioner's counsel *198 referred to the "final revised draft of the proposed retirement, profit sharing plan and trust of the Arlington Realty Company," and suggested that the "plan and trust be approved by your company" prior to his taking steps "to effect final clearance with Internal Revenue." On April 10, 1954, the petitioner's stockholders and directors held a meeting at which Carl presented the final revised drafts of the retirement plan and trust agreement. The plan and trust agreement were adopted but the copies of the plan and trust agreement attached to the minutes of the meeting were not signed. At another meeting held on October 27, 1954, the board adopted certain changes suggested by the Internal Revenue Service. Petitioner's counsel was instructed to file the plan as changed with the Internal Revenue Service for final approval. Signed copies of the plan and trust agreement were attached to the minutes of the meeting and the following statement, in Carl's handwriting, appears in several places on the documents attached to the minutes of the board meeting: "Approved by Board of Directors October 27, 1954 Louis C. Carl Secy." The retirement plan finally adopted by the petitioner in 1954 differed *199 materially from the Wellington plan. The first such change occurred in 1953 when the alreadymentioned point system replaced the formula originally contained in the Wellington brochure and the expanded scale of percentage payments appeared. The next draft, which appeared in 1954, contained a number of minor changes and in addition the point system, by which an employee's credits were to be computed, was spelled out for the first time. It provided that eligible employees would be credited with 4 points for each year of service and 1 point for each $1,000 of salary, and the amount credited to an employee's account would be that proportion of the employer's contribution as the employee's total number of points bears to the total number of points of all such employees. Another change, which appeared for the first time in 1954, specified that under no circumstances was the amount contributed to the trust by the petitioner to be allowed to reduce its net profits below $25,000 per year. The trust agreement adopted on April 10, 1954, differs from the sample agreement in the Wellington plan only by the addition of the phrase "and applicable Federal statutes" to a paragraph which stated that *200 all matters pertaining to the construction, validity, and effect of the plan would be determined "in accordance with the laws of the State of Virginia and applicable Federal statutes." Both the Wellington plan and the plan and trust agreement eventually adopted by petitioner provide that the profit-sharing retirement plan was incorporated into the trust agreement by reference. Certain other changes were made in October 1954 upon the advice of the Internal Revenue Service. These changes included the addition of a provision to the effect that failure to contribute for a period of 3 consecutive years, during which time the petitioner was obligated to make payments to the plan, would indicate a prima facie intent to terminate the plan, whereupon the interests of the participants would become fully vested. The trust agreement was also modified to bestow upon the so-called benefit committee, which consisted of three directors responsible for the administration of the fund, the right to evaluate the investments of the trust and to adjust the account of each employee in order to conform with the evaluation. On December 23, 1954, petitioner formally announced the retirement program to its *201 employees. The announcement reads in part as follows: As previously announced, your Company has been working on an Employees Retirement Plan for several years, in collaboration with our legal and tax consultants, as well as representatives of Internal Revenue Service. The Plan provides for Annual contributions to a Trusteed Fund, at the corporation option, and such funds are irrevocable by the Corporation. Each employee, upon serving the company for three full years on the anniversary date of December 31st is eligible for participation in this Fund. In case an employee severs his connection with the company for any reason whatsoever before completing five full years of service, his interest in the Fund is forfeited. The announcement also outlined the method by which the employees were to obtain credits in the fund, and stated that contributions amounting to $16,200 and $12,004.22 were made to the fund by the petitioner in 1952 and 1953, respectively. The plan and trust agreement, as executed by the board of directors on October 27, 1954, were submitted to the Internal Revenue Service for approval. During the course of the negotiations an official of the Internal Revenue *202 Service advised petitioner that its trust did not have any corpus and one should be created, whereupon the petitioner opened a checking account on May 9, 1956, at the Arlington Trust Co., Inc., and deposited $250 in cash for each of the first 4 years of the alleged existence of the trust. On March 11, 1958, petitioner was advised by the district director's office at Richmond that the pension plan it had submitted for approval met the requirements of section 401(a) and that the trust was entitled to exemption under section 501(a) of the Internal Revenue Code of 1954. Petitioner has continued to make contributions to the trust and these funds have been invested and reinvested by the trustees, mostly in second trust notes. At the date of this proceeding the assets of the trust fund exceeded $100,000. On all of the literature presented to the petitioner's employees the effective date of the plan and trust was stated to be December 15, 1952. Opinion KERN, Judge: Petitioner on brief states the issue as follows: "Was there, as a matter of law and fact, a qualifying pension plan and trust (as defined in Section 165 of the 1939 Code) in existence during either of *203 the years 1952 and 1953, or both?" Respondent's statement of the issue is practically the same. It is: Were the assets contributed by petitioner to a temporary trustee "at the end of each of the years 1952 and 1953, respectively, contributions under an existing pension or profit-sharing plan and paid into a trust exempt under section 165(a) of the Internal Revenue Code of 1939, and therefore deductible under section 23(p) * * *?" We accept petitioner's argument that the law of the State of Virginia is applicable, Helvering v. Stuart, 317 U.S. 154; Dejay Stores v. Ryan, 229 F. 2d 867; Wesley Heat Treating Co., 30 T.C. 10, affd 267 F. 2d 853; and that an oral trust in personal property may be created in that State, Riggan's Adm'r v. Riggan, 93 Va. 78, 24 S.E. 920; Young v. Holland, 117 Va. 433, 84 S.E. 637. However the question remains whether the evidence appearing in the record before us is such as to justify a conclusion that petitioner, which has the burden, has proved that there was an intention on its part to create a presently existing trust in the 2 taxable years. Such an intention must be proved *204 with reasonable certainty. Woods v. Stull, 182 Va. 888, 30 S.E. 2d 675, 682. The circumstances [2] and most of the contemporary written documents indicate that while there was a general intention formed by petitioner's management in 1952 to create in the future some kind of pension plan and/or trust modeled on the so-called Wellington plan, there was no intention on that date to create a presently existing specific pension plan and/or trust and that such an intention was not formed until after the taxable years. On the other hand there is the self-serving testimony of two of petitioner's directors given long after the events in question to the effect that the directors at their meeting of December 15, 1952, formulated an intention then and there to immediately create on that date a pension plan and/or trust in all respects similar to the so-called Wellington plan and trust as interlined by Carl, subject only to such modifications as were insisted upon by the Internal Revenue Service. *205 After a consideration of the entire record we are unable to conclude that petitioner intended to and did create during either of the 2 taxable years a specific pension plan and/or trust which was in existence during these years. See Dayton Co. v. Commissioner, 90 F. 2d 767, affirming a Memorandum Opinion of the Board of Tax Appeals, which quoted from that opinion as follows: In short, it is our opinion that there was no intention of establishing a valid and enforceable trust during the year before us and that none was established. All the action taken by the petitioner during the fiscal year before us, including ear-marking of bonds and setting them aside, was merely preparatory to the establishment of a pension trust, and no trust was established in that year. * * * Accordingly, we decide the issue before us against the petitioner which had the burden of proof. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all references relate to the Internal Revenue Code of 1939.↩
2. These include the fact that the contributions claimed as deductions during the taxable years were made, not to the two trustees named in the draft of the trust instrument considered on December 15, 1952, but to one "Temporary Trustee," whose fiduciary duty, as we interpret the facts, was to act in the nature of an escrow agent and to turn over these contributions to the trustees of the pension or retirement trust when and if it was finally created, and also, that the rights of the beneficiaries of the trust finally created differed materially from those provided for in the sample plan (which was included in the sample trust by reference) which was considered in December 1952.↩